UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,                   Case No. 20-cr-20449

v.                                  Paul D. Borman
                                  United States District Judge

ROBERT LEE TAYLOR (D2)

               Defendant.

_____/

### OPINION AND ORDER REJECTING DEFENDANT ROBERT LEE TAYLOR'S OBJECTIONS TO THE PROBATION DEPARTMENT'S CONCLUSION IN ITS PRE-PLEA CRIMINAL HISTORY INVESTIGATION REPORT (ECF NO. 77) THAT DEFENDANT QUALIFIES AS AN ARMED CAREER CRIMINAL UNDER 18 U.S.C. § 924(e) (ECF NO. 81)

Defendant Robert Lee Taylor is charged in the Indictment in this case with felon in possession of a firearm, possession with intent to distribute cocaine, and possession of a firearm in furtherance of a drug trafficking crime. The Indictment further charges that Taylor qualifies as an Armed Career Criminal under the Armed Career Criminal Act, 18 U.S.C. § 924(e), because he has three prior convictions for "serious drug offenses" under Michigan state law. Taylor filed an objection to the application of the Armed Career Criminal enhancement in this case, arguing that his Michigan cocaine convictions are not proper predicate offenses under the Armed

1

Career Criminal Act because Michigan law prohibits more cocaine-related substances than federal law. The Court has construed this objection as a motion, and the motion has been fully briefed.

On Tuesday, August 9, 2022, the Court held an evidentiary hearing on Defendant's objections to applying Defendant's three prior Michigan cocaine convictions as predicate offenses under the Armed Career Criminal Act, at which both parties presented expert scientific testimony on Michigan and federal cocaine definitions. Counsel for the parties appeared and presented oral argument to the Court on Thursday, August 11, 2022.

For the reasons set forth below, the Court REJECTS Defendant Taylor's objections to the application of the Armed Career Criminal enhancement in this case.

## I. BACKGROUND

On September 23, 2020, Defendant Robert Lee Taylor was charged in the present Indictment, with respect to a January 7, 2020 offense of "knowingly and unlawfully possess[ing] with intent to distribute cocaine base, commonly known as crack cocaine, a Schedule II controlled substance," with: Count Two, Possession with Intent to Distribute Controlled Substances (Cocaine), in violation of 21 U.S.C. § 841(a)(1); Count Four, Possession of firearms in furtherance of drug trafficking crimes, in violation of 18 U.S.C. § 924(c); and Count Six, Felon in Possession of a

2

Firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(e). (ECF No. 11, Indictment.)[1]

The Indictment further alleges in Count Six that, pursuant to 18 U.S.C. § 924(e),

Taylor "is an armed career criminal," having previously been convicted, in

Michigan, of the following serious drug offenses on the following dates:

- September 21, 1999: Controlled substance delivery/manufacture less than 50 grams of cocaine;

- April 13, 2011: Controlled substance delivery/manufacture less than 50 grams of cocaine; and

- January 9, 2013: Controlled substance delivery/manufacture less than 50 grams of cocaine.

(*Id.*, PageID.27-28.)

The January 19, 2022 Amended Pre-Plea Criminal History Report, prepared

at Defendant Taylor's request by the United States Probation Office, concludes that

"it appears [Robert Taylor] would qualify as an armed career criminal. [He] has three

prior serious drug offenses (Docket Numbers 99-008416-01-FH, 11-001797-FH,

---

[1] The Indictment also charges co-defendant, Douglas Polk, with: Counts One, Possession with Intent to Distribute a Controlled Substance (Cocaine Base), in violation of 21 U.S.C. § 841(a)(1); Count Three, Possession of firearms in furtherance of drug trafficking crimes, in violation of 18 U.S.C. § 924(c); and Count Five, Felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (ECF No. 11, Indictment.)

and 2011-0000015176-FH).” (ECF No. 77, Amended Pre-Plea Criminal History Report, PageID.418.)

On March 6, 2022, Taylor filed his Objections to the Armed Career Criminal Enhancement. (ECF No. 81, Def. Obj.) Taylor argues that his prior Michigan cocaine convictions are not proper predicate offenses under the Armed Career Criminal Act because the Michigan statutory definitions of cocaine are broader than the federal definitions of cocaine. Taylor contends that the Michigan definition of “cocaine” “covers all cocaine derivatives,” but that the federal definition of “cocaine” expressly excludes the derivative [$^{123}$I]ioflupane. Taylor further argues that the Michigan statute covers “all cocaine stereoisomers,” but that the federal law “covers optical and geometric isomers” only, and that “[t]here are six diastereomers of cocaine that are unambiguously covered in M[ichigan] but not at the US level.” (*Id.* PageID.494.)

On May 2, 2022, the government filed a Response in opposition to Taylor’s objections. (ECF No. 89, Gov’t Resp.) The government argues that Michigan and federal law prohibit the same isomers of cocaine, and accordingly, Taylor’s Michigan cocaine convictions qualify as predicate offenses under the Armed Career Criminal Act. The government filed a Notice of Supplemental Authority on June 14, 2022, providing the sentencing transcript in *United States v. Wilkes*, No. 1:21-cr-42,

4

ECF No. 89 (W.D. Mich. May 12, 2022) (Neff, J.), *appeal filed*, No. 22-1436 (6th Cir. May 13, 2022), where the court found that the defendant's prior Michigan cocaine convictions were proper predicates under the Armed Career Criminal Act. (ECF No. 95.) On August 3, 2022, the government filed a second Notice of Supplemental Authority with this Court, providing the sentencing transcript in *United States v. Johnson*, No. 1:21-cr-34, ECF No. 133 (W.D. Mich. July 8, 2022) (Maloney, J.), *appeal filed*, No. 22-1621 (6th Cir. July 15, 2022), in which the court found the defendant's prior Michigan cocaine convictions were proper predicate "serious drug felonies" under 21 U.S.C. §§ 851, 841(a)(1), and (b)(1)(A). (ECF No. 103.)

Taylor filed a Reply brief on June 30, 2022, again arguing that his prior Michigan cocaine-related drug offenses are not "serious drug offenses" as predicate offenses pursuant to the Armed Career Criminal Act. (ECF No. 98, Def. Reply.)

## II. DISCUSSION

### A. Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)

The Armed Career Criminal Act (ACCA) carries a mandatory minimum sentence of fifteen years in prison for a person who violates 18 U.S.C. § 922(g) (felon in possession) and has three prior convictions by any court for a "violent felony" or a "serious drug offense." 18 U.S.C. § 924(e)(1). A "serious drug offense"

is defined, as relevant here, as "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law[.]" *Id.* § 924(e)(2)(A)(ii).

Section 102 of the Controlled Substances Act (CSA) in turn defines a "controlled substance" to "mean[] a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter." 21 U.S.C. § 802(6). Federal Schedule II Controlled Substances include the following cocaine-related substances: "cocaine, its salts, optical and geometric isomers, and salts of isomers; ecgonine, its derivatives, their salts, isomers, and salts of isomers; or any compound, mixture, or preparation which contains any quantity of any of the substances referred to in this paragraph." 21 U.S.C. § 812(c), Schedule II(a)(4). But federal Schedule II cocaine-related substances do not, as of September 2015, include [$^{123}$I]ioflupane, a radioactive isotope of ioflupane in a pharmaceutical product known as "DaTscan," used to evaluate and diagnosis patients with Parkinson's disease. [$^{123}$I]ioflupane was, by definition, a Schedule II controlled substance because it is derived from cocaine via ecgonine, but was it excepted from Schedule II in September 2015. 21 C.F.R. § 1308.12 Schedule II(b)(4)(ii); *see United States v.*

6

*Jackson*, 36 F.4th 1294, 1301-02 (11th Cir. 2022) ("[$^{123}$I]ioflupane has not been a federally 'controlled substance,' as defined in 21 U.S.C. § 802, since September 2015."). Unlike [$^{123}$I]ioflupane, non-radiolabeled (non-radioactive) ioflupane is a Schedule II controlled substance and it is not exempted under federal law.

To determine whether a prior state conviction constitutes a "serious drug offense" for purposes of the ACCA, courts use "a formal categorical approach, looking only to the statutory definitions of the prior offenses, and not to the particular facts underlying those convictions." *United States v. Eason*, 919 F.3d 385, 388 (6th Cir. 2019) (quoting *Taylor v. United States*, 495 U.S. 575, 600 (1990)); *see also Mathis v. United States*, 579 U.S. 500, 504 (2016) (discussing the categorical approach). However, when a state statute includes multiple, alternative elements, not all of which meet the ACCA's definition for a predicate offense, and thus is "divisible," a modified categorical approach may be employed. *Eason*, 919 F.3d at 388 (citing *Descamps v. United States*, 570 U.S. 254, 257 (2013)); *Mathis*, 579 U.S. at 505-06 (discussing the modified categorical approach applied to "divisible" statutes). The modified categorical approach allows a court to consult a limited class of documents "to determine which alternative formed the basis of the defendant's prior conviction," and then compare the elements of the conviction to the elements of the generic offense. *Eason*, 919 F.3d at 388 & n.1 (noting that, under the modified

7

categorical approach, "[a] court is 'generally limited to examining the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented.' *Shepard v. United States*, 544 U.S. 13, 16 (2005).")"; *see also Mathis*, 579 U.S. at 505-06 (explaining that "[t]he court can then compare that crime, as the categorical approach commands, with the relevant generic offense."). "If the elements of the [state] conviction are the same or narrower [than the federal generic offense], [the state conviction] constitutes a predicate offense under the ACCA." *Eason*, 919 F.3d at 388 (citing *Descamps*, 570 U.S. at 257).

**B.    Whether Taylor's Three Prior Michigan Drug Convictions Are Predicate Offenses Under the ACCA**

The Michigan controlled substance statute provides that "a person shall not manufacture, create, deliver, or possess with intent to manufacture, create, or deliver a controlled substance, a prescription form, or a counterfeit prescription form." Mich. Comp. Laws § 333.7401(1). The federal courts have previously addressed Mich. Comp. Laws §333.7401 and determined that it is divisible, which allows this Court to apply the modified categorical approach. *See United States v. House*, 872 F.3d 748, 753 (6th Cir. 2018) (finding "Michigan's controlled-substance statute is divisible") (citing *United States v. Tibbs*, 685 F. App'x 456 (6th Cir. 2017)); *see also*

8

*United States v. Pittman*, 736 F. App'x 551, 555 (6th Cir. 2018) ("Because Michigan courts treat the specific substance as an element of the offense, § 333.7401(2)(a)(iv) is divisible."), *cert. denied*, 139 U.S. 608 (2018). As the Sixth Circuit Court of Appeals has recognized, "Michigan courts frequently note that the specific substance a defendant is charged with possessing or delivering is one of the elements of a § 333.7401 violation." *Pittman*, 736 F. App'x at 555.

Accordingly, the Court must identify the particular subsection § 333.7401 that Taylor was convicted of violating. *See Pittman*, 736 F. App'x at 554. Each of Taylor's three prior state drug convictions were for delivering cocaine or possessing it with the intent to deliver, in violation of Mich. Comp. Laws § 333.7401(2)(a)(iv), which provides that a person "shall not manufacture, create, deliver, or possess with intent to manufacture, create, or deliver a controlled substance" "in an amount less than 50 grams[.]" (See ECF Nos. 86, 86-1, 86-2, 86-3, Stipulation and state conviction records.)

Taylor argues in his Objection that his three prior state drug convictions cannot support an ACCA enhancement in this case because the Michigan statutory definition of cocaine includes substances that are not covered by the federal definition of cocaine. Michigan's statute defines cocaine as a schedule 2 controlled substance and includes the following cocaine-related substances: "cocaine, its salts,

9

stereoisomers, and salts of stereoisomers when the existence of the salts, stereoisomers, and salts of stereoisomers is possible within the specific chemical designation." Mich. Comp. Laws § 333.7214(a)(iv). As stated above, federal Schedule II Controlled Substances include the following cocaine-related substances: "cocaine, its salts, optical and geometric isomers, and salts of isomers; ecgonine, its derivatives, their salts, isomers, and salts of isomers; or any compound, mixture, or preparation which contains any quantity of any of the substances referred to in this paragraph." 21 U.S.C. § 812(c), Schedule II(a)(4).

Taylor argues that the Michigan statute is overbroad, for purposes of ACCA enhancement, for two reasons: (1) the Michigan statute includes all cocaine derivatives, but the federal definition exempts the derivative [123I]ioflupane; and (2) the Michigan statute covers all cocaine "stereoisomers," but the federal definition covers "optical and geometric isomers." Taylor relies on an expert report by chemist Gregory B. Dudley, Ph.D (ECF No. 81, Dudley Report, PageID.498-503), and a supplemental report by Dr. Dudley (ECF No. 98-2, Dudley Supp. Report, PageID.902-07).

The government responds that Taylor is mistaken, and that (1) there has never been a realistic probability of a Michigan controlled-substance prosecution involving [123I]ioflupane; and (2) although the Michigan and federal statutes use

10

different terminology ("stereoisomers" versus "optical and geometric isomers"), those are interchangeable terms that refer to the same isomers of cocaine, and thus every substance at issue prohibited by Michigan law is also defined as a controlled substance under federal law. The government relies on a report by chemist Dr. Scott Denmark. (ECF No. 89-6, Denmark Report, PageID.679-88.)

The Court will address each argument in turn.

## C.    The [$^{123}$I]ioflupane Exemption

[$^{123}$I]ioflupane is a radioactive cocaine derivative that is used in a radiopharmaceutical called "DaTscan" in hospital brain scans to detect Parkinson's disease. 80 FR 54715-01, 2015 WL 5265212 (Sept. 11, 2015). [$^{123}$I]ioflupane was federally decontrolled in September 2015 (*id.*), and the Code of Federal Regulations expressly exempts it from Schedule II. 21 C.F.R. § 1308.12(b)(4)(ii). However, non-radioactive ioflupane, a cocaine derivative, remains a Schedule II controlled substance.

Taylor argues in his Objection that his prior state cocaine convictions cannot support an ACCA enhancement because the federal definition of cocaine exempts [$^{123}$I]ioflupane while the Michigan definition covers all cocaine derivatives, and thus the Michigan statutory definition of cocaine is broader than the federal definition of cocaine. Taylor relies on the report of his expert, chemist Gregory B. Dudley, Ph.D.,

11

and also the decision by another court in this District, *United States v. Lofton*, No. 20-20221, 2021 WL 5494782 (E.D. Mich. Nov. 23, 2021) (Tarnow, J.), where the court held that, for purposes of the Career Offender designation, pursuant to U.S.S.G. § 4B1.1(a), the Michigan definition of cocaine is broader than the federal definition because "the federal law excludes certain stereoisomers and derivatives of cocaine that are criminalized in Michigan." *Id.* at *2. Taylor notes that the court in *Lofton* cited for support a September 2021 decision from the Western District of Michigan, *United States v. Carter*, Case No. 1:21-CR-00003 (W.D. Mich.), in which Chief Judge Hala Y. Jarbou "held that the defendant was not an armed career criminal because 'clearly the Michigan definitions [of cocaine and heroin] are broader than the federal definition[s].'" *Lofton*, 2021 WL 5494782, at *2 (citing *Carter*, No. 1:21-CR-00003 (ECF No. 39, Sentencing Hr'g Tr. at 20)). In both the *Lofton* and *Carter* decisions, however, the courts were provided with only the report of the defendants' expert, Dr. Dudley, and did not have the benefit of the report and opinion of the government's expert in this case, Dr. Scott E. Denmark.

Taylor also relies on an unpublished decision from the Ninth Circuit Court of Appeals, *United States v. Holliday*, 853 F. App'x 53 (9th Cir. 2021), which held that the defendant's prior conviction for selling cocaine in violation of a Montana statute was not a controlled substance offense under the Career Offender guidelines because

Montana's definition of cocaine is broader than the federal counterpart, which excludes [$^{123}$I]ioflupane, while the Montana statute did not. *Holliday*, 853 F. App'x at 55. However, that holding in *Holliday* was subsequently questioned in *United States v. House*, 31 F.4th 745 (9th Cir. 2022) (per curiam) (Christen, J., concurring), for the *Holliday* court's failure to employ the "realistic probability" analysis and determine whether Montana would actually prosecute the distribution of [$^{123}$I]ioflupane, "a substance the Food and Drug Administration excepted from the federal definition because it is the active ingredient in a product that 'itself presents no practical possibility of abuse, misuse, diversion or clandestine production.'" *House*, 31 F.4th at 756-60; *see also id.* at 765 (Wu, J., concurring) (recommending application of the "reasonable probability" analysis). *See also Holliday*, 853 F. App'x at 55-56 (Watford, J., dissenting) (recommending that the "realistic probability" analysis be employed).

The government argues in response that the Court should find that Michigan law is not broader than federal law on the basis of [$^{123}$I]ioflupane's exception because there is no realistic probability of a controlled-substance prosecution involving [$^{123}$I]ioflupane. (ECF No. 89, Gov't Resp., PageID.543-46.) As the government explains, the United States Supreme Court has "[q]ualif[ied]" the categorical approach and held that the analysis "is not an invitation to apply 'legal imagination'

13

to the state offense." *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013) (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007)).[2] Instead, "there must be a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside" the federal offense. *Id.* (internal quotation marks omitted). The government contends that there is no realistic probability that any Michigan cocaine conviction has ever involved [$^{123}$I]ioflupane because the following features of [$^{123}$I]ioflupane make it impossible to abuse or traffic: (1) it is produced only in small amounts "by a highly technical and complex synthetic route which requires specialized equipment;" (2) it is radioactive; (3) storage longer than 24 hours is "not possible;" (4) the fact that it "will not be stored as inventory" limits the possibility of diversion and abuse; (5) an abuser would need to "inject nearly 6,000 vials or 15 liters of [$^{123}$I]ioflupane-containing DaTscan$^{TM}$ to achieve a subjective" high – "a volume likely to cause death if administered intravenously;" and (6)

---

[2] The Court further notes, but does not rely on, the very recent decision by the Sixth Circuit Court of Appeals in *United States v. Fields*, --- F.4th ---, No. 20-5521, 2022 WL 3221712 (6th Cir. Aug. 10, 2022), which applied the realistic probability analysis in the context of a Kentucky statute regarding a different controlled substance. *Id.* at *19-20 (finding that although federal regulations exempted an over-the-counter inhaler containing certain levels of a form of methamphetamine, but Kentucky law did not, there is no realistic probability that Kentucky would prosecute someone for "trafficking" such an inhaler, and thus the state law was not overbroad) (citing *Duenas-Alvarez*, 549 U.S. at 193).

14

"extraction of [$^{123}$I]ioflupane from DaTscan$^{TM}$ would be impossible due to its limited production and availability," and would be "technically complex" and "require advanced equipment not available to the general public." (ECF No. 89, Gov't Resp., PageID.543-44, citing Ex. 2, DEA Eight-Factor Analysis (Apr. 2015), pp. 2, 5, 6, 9, PageID.602, 605-06, 609.) The government explains that, as of 2015, there were "no reports of abuse of [$^{123}$I]ioflupane," and the DEA ultimately concluded that [$^{123}$I]ioflupane is "not abusable." (*Id.*) The government further contends that, for this reason, [$^{123}$I]ioflupane has always been excluded from Michigan's schedules by operation of its statute that excludes substances that are "in a proportion or concentration to vitiate the potential for abuse." (*Id.*, PageID.544, citing Mich. Comp. Laws § 333.7227(1).)

Taylor argues again in his Reply brief that the current federal law exempts [$^{123}$I]ioflupane, which creates a "mismatch" with the Michigan definition of cocaine, which does not contain a similar express exemption. (ECF No. 98, Def. Reply, PageID.867-68.) Taylor's arguments do not refute the government's contention that there is no realistic probability that any Michigan cocaine conviction has ever involved [$^{123}$I]ioflupane because the features of [$^{123}$I]ioflupane make it impossible to abuse or traffic.

Taylor instead cites to a recent Eleventh Circuit case, *United States v. Jackson*, 36 F.4th 1294 (11th Cir. 2022), which found that the defendant's prior state convictions did not qualify as "serious drug offenses" under the ACCA because [123I]ioflupane was not excluded by state law at the time of his state convictions, but was excluded from federal law at the time of sentencing. However, aside from that case constituting non-binding authority in this Circuit, *Jackson* is distinguishable because the *Jackson* court did not employ the United States Supreme Court's realistic probability analysis regarding the impossibility to abuse or traffic [123I]ioflupane. In addition, the *Jackson* court found that the Florida state law at the time of conviction *included* [123I]ioflupane because, after the United States exempted [123I]ioflupane in 2015, Florida followed suit and expressly exempted [123I]ioflupane from its Schedule II. *Id.* at 1303 (finding that this amendment "confirms that, before … Florida law criminalized sale and possession of ioflupane as a part of its prohibition on the sale and possession of '[c]ocaine or ecgonine, including any of their stereoisomers, and any salt, compound, derivative, or preparation of cocaine or ecgonine.'"). As the government notes in its Response however, Michigan did not prohibit [123I]ioflupane after it was exempted under federal law. (ECF No. 89, Gov't Resp., PageID.542.)

Taylor also relies on a recent United States Supreme Court case, *United States v. Taylor*, 142 S. Ct. 2015 (2022), which addressed the issue of whether an "attempted Hobbs Act robbery" qualifies as a "crime of violence" under 18 U.S.C. § 924(c)(3)(A). *Id.* at 2018. However, that case in inapposite. The Hobbs Act makes it a federal crime to commit, attempt to commit, or conspire to commit a robbery with an interstate component. 18 U.S.C. § 1951(a). Section 924(c) authorizes further punishments for those who use a firearm in connection with a "crime of violence." For purposes of § 924(c), a federal felony qualifies as a "crime of violence" if it has the element of "the use, attempted use, or threatened use of physical force against the person or property of another." In *Taylor*, the government argued that the defendant's attempted Hobbs Act robbery constituted a "crime of violence" under 18 U.S.C. § 924(c)(3)(A), and faulted the defendant for "failing to identify a single case in which it has prosecuted someone for attempted Hobbs Act robbery without proving a communicated threat." *Id.* at 2024. The government contended "that a defendant must present evidence about how his crime of conviction is normally committed or usually prosecuted." *Id.* The Supreme Court disagreed, finding that § 924(c) did not "mandate an empirical inquiry into how crimes are usually committed, let alone impose a burden on the defendant to present proof about the government's own prosecutorial habits." *Id.* at 2025. Rather, courts must "[l]ook at

17

the elements of the underlying crime and ask whether they require the government to prove the use, attempted use, or threatened use of force." The Supreme Court concluded that "to convict a defendant of attempted Hobbs Act robbery, the government does not have to prove any of those things," so long as the defendant's intention and some other substantial act are present. *Id*. at 2025-26. The Supreme Court expressly distinguished the "realistic probability" analysis from its *Duenas-Alvarez* case as having no application in the case before it because the statute at issue in *Taylor* "asks only whether the elements of one federal law align with those prescribed in another," and did not inquire "whether a 'realistic probability' existed that the State 'would apply its statute to conduct that falls outside' the federal generic definition." *Id.* (quoting *Duenas-Alvarez*, 549 U.S. at 193). Accordingly, the *Taylor* case has no application to the government's arguments in this case regarding whether there is a "realistic probability" that Michigan would apply its statute to a conviction for possession of [$^{123}$I]ioflupane.

The Court agrees with the government that Taylor's overbreadth arguments with respect to [$^{123}$I]ioflupane are unavailing, that Michigan's law is not "overbroad on its face" because it does not expressly include conduct not covered by the federal law, but rather is silent as to the existence of [$^{123}$I]ioflupane, and that Taylor has failed to show a "realistic probability" that he could be prosecuted under Michigan

18

law for possession of [$^{123}$I]ioflupane. *See United States v. Vega-Ortiz*, 822 F.3d 1031, 1036 (9th Cir. 2016) (rejecting defendant's "overbreadth arguments" with regard to the federal regulation's excluding of product containing "L-meth," which is not similarly expressly excluded under California law, because the state law is "silent as to the existence of a parallel [L-meth] exception," and the defendant failed to show a "realistic probability" that he would be prosecuted under state law for possession of the excluded product containing L-meth) (citing *United States v. Burgos-Ortega*, 777 F.3d 1047, 1055 (9th Cir. 2015)). The Sixth Circuit Court of Appeals has similarly applied the realistic probability analysis. *See United States v. Jackson*, 995 F.3d 476, 482 (6th Cir. 2021) (finding the defendant "fails to demonstrate a 'realistic probability' that Kentucky law applies in the way he suggest," and thus is broader than federal law, because he "has not identified a single case where one has been prosecuted under the Kentucky statute because she innocently picked up and threw away drugs"); *United State v. Burris*, 912 F.3d 386, 396-98 (6th Cir. 2019) (en banc) (employing realistic probability analysis and finding that relevant Ohio statutes were overbroad, based in part on prior state court decisions broadly applying statutes); *see also Fields*, 2022 WL 3221712, at *19-20 (applying the realistic probability analysis to find Kentucky statute not overbroad).

In *United States v. Wilkes*, District Judge Janet T. Neff considered whether the federal exemption of [$^{123}$I]ioflupane creates an inconsistency between the Michigan and federal schedules, and adopted the government's argument that it did not. Judge Neff found in a May 12, 2022 sentencing hearing that "there is no realistic probability that Mr. Wilkes' Michigan convictions were in any way based on Ioflupane," noting that [$^{123}$I]ioflupane "would have been virtually impossible" to get, it has "certain radioactive properties and a very short half life and a limited storage life," it was limited to "small batch manufacturing because the production of that chemical requires a highly technical and complex process, which requires specialized equipment, and it's not available to the general public." *United States v. Wilkes*, Case No. 1:21-cr-42 (W.D. Mich. May 12, 2022) (ECF No. 89, Sentencing Hr'g Tr.), *appeal filed*, Case No. 22-1436 (6th Cir. May 13, 2022).

The Court finds that the government has shown that there is no realistic probability that any Michigan cocaine convictions have, or could, involve [$^{123}$I]ioflupane, and that Taylor has failed to show a "realistic probability" that he would be prosecuted under Michigan law for possession of [$^{123}$I]ioflupane. *See Duenas-Alvarez*, 549 U.S. at 193 ("To show that reasonable probability," the offender "must at least point to his own case or other cases in which the state courts in fact did apply the statute in the special (nongeneric) manner for which he

20

argues.").[3] Therefore, the Court finds that the Michigan cocaine statute is not categorically overbroad when compared to the federal definition of cocaine based on the federal exclusion of [$^{123}$I]ioflupane.

### D.    "Stereoisomers" versus "Optical and Geometric Isomers"

Taylor next argues in his Objection that Michigan's statutory definition of cocaine is broader than the federal definition of cocaine because Michigan "covers all cocaine stereoisomers" but the federal definition "covers optical and geometric isomers." (ECF No. 81, Def. Obj., PageID.494) Taylor relies on the report of his expert, Dr. Dudley, for the proposition that, based on these differences, Michigan "unambiguously covers diastereomers of cocaine, which are not unambiguously covered at the US level." (ECF No. 81, Dudley Report, PageID.502.)

The government responds, relying on the report of its expert, Dr. Denmark, that the Michigan statute uses newer terminology (stereoisomers) while the federal statute definition uses older terminology (optical and geometric isomers), but that although the terminology is different, the terms are interchangeable and prohibit the same isomers of cocaine. (ECF No. 89, Gov't Resp., PageID.546-47.)

---

[3] The Court further notes that Michigan law provides that "[a] substance that contains 1 or more controlled substances in a proportion or concentration to vitiate the potential for abuse is excluded." Mich. Comp. Laws § 333.7227(1).

### 1.    The experts' reports on isomers

Defendant Taylor and the government have each retained separate experts in organic chemistry and stereochemistry to analyze the definitions of cocaine in the Michigan and federal statutes. The Court will first discuss the issues upon which both experts agree.

Both experts agree that cocaine is a molecule with the molecular formula of $C_{17}H_{21}NO_4$. There are many ways in which 17 carbon atoms, 21 hydrogen atoms, one nitrogen atom, and four oxygen atoms can be arranged in space and connected, and all chemical compounds composed of these four atoms in these ratios are called isomers. Accordingly, any compounds having the molecular formula $C_{17}H_{21}NO_4$, are isomers of cocaine.

Both experts agree that stereoisomers are molecules that have the same atomic composition and the same the atomic connections, but that differ in how the atoms are arranged in space. Stereoisomers include enantiomers (mirror-image isomers) and diastereomers (non-mirror-image isomers). Finally, the experts agree that there are eight stereoisomers of cocaine, including natural cocaine itself, and that both the state and federal definitions of cocaine include cocaine itself, *(R)*-cocaine, and cocaine's mirror-image stereoisomer, *(S)*-cocaine, which is called the enantiomer or "optical" isomer of cocaine. (ECF No. 81, Dudley Report, PageID.498, 502) (ECF

No. 89-6, Denmark Report, PageID.685-86.) (ECF No. 89-7, *Robinson* Evid. Hr'g

Tr., pp. 66-67.)

However, the two experts disagree as to how to classify the remaining six

stereoisomers of cocaine. Both experts agree that Michigan's statutory definition

includes these six stereoisomers. Taylor's expert, Dr. Dudley, contends that these

remaining six stereoisomers are not included in the federal statute, while the

government's expert, Dr. Denmark, asserts they are. Therefore, the question for the

Court to decide is whether the federal reference to "geometric isomers" includes

these six remaining cocaine stereoisomers. The government answers "Yes" but the

defendant Taylor answers "No."

### 2.    "Stereoisomers" and "Geometric Isomers"

Taylor's expert, Dr. Dudley states in his report that "[l]aws covering optical

and geometric isomers can be ambiguous, because these are imprecise terms." Dr.

Dudley asserts that the term "geometric isomers" in the federal law is an older or

"obsolete" and ambiguous term for a subset of diastereomers called *cis-trans*

isomers. Dr. Dudley contends that there are no *cis-trans* isomers of cocaine, and

accordingly, while the Michigan statute covers all stereoisomers of cocaine,

including natural cocaine, its enantiomer or "optical" isomer, and diastereomers, the

federal statute only covers natural cocaine and its "optical" isomer, and does not include the six diastereomers of cocaine. (ECF No. 81, Dudley Report, PageID.502.)

The government's expert, Dr. Denmark, asserts that while chemists used the term "geometric" to refer more narrowly to *cis-trans* isomers in the past, that historical use of the term is no longer the prevailing understanding, and the term "geometric isomers" is now understood to be synonymous with "diastereomers" – or any isomer, other than the mirror-image isomer, that shares the same atomic connectivity but has atoms arranged differently in space. Dr. Denmark asserts that, under this prevailing view, although the federal definition of isomers as "optical" or "geometric" is archaic and discouraged, the six cocaine diastereomers are "geometric" isomers and thus the Michigan and federal statutory definitions cover the same eight stereoisomers of cocaine. Dr. Denmark further opines that the six cocaine stereoisomers at issue can also be characterized using the "cis-trans" nomenclature, and thus the six diastereomers qualify as "geometric" isomers even using the term's historical and narrower interpretation. (ECF No. 89-6, Denmark Report, PageID.685-87.)

Two earlier Michigan district courts – one from the Eastern District and one from the Western District – found that the Michigan definition of cocaine is broader than the federal definition. *See United States v. Lofton*, No. 20-20221, 2021 WL

24

5494782, at *2 (E.D. Mich. Nov. 23, 2021) (Tarnow, J.); *United States v. Carter*, No. 21-cr-03 (W.D. Mich. Sept. 14, 2021) (ECF No. 39, Sentencing Hr'g Tr. at 20) (Jarbou, C.J.). However, those two courts only had the benefit of Dr. Dudley's expert report, and did not have Dr. Denmark's report, and both opinions were rather cursory, broadly stating, without much analysis, that the federal definition of cocaine is narrower than the Michigan definition.

Since then, district courts in the Western District of Michigan have ruled three times, upon receipt and review of the expert reports of both Dr. Dudley and Dr. Denmark, and following evidentiary hearings, that Dr. Denmark's analysis was more persuasive and that the Michigan definition of cocaine is not broader than the federal definition, and that the defendants' prior state cocaine convictions therefore counted as predicate offenses under the ACCA. *See United States v. Johnson*, No. 21-cr-34 (W.D. Mich. July 11, 2022) (ECF No. 133, Sentencing Hr'g Tr.) (Maloney, J.), *appeal filed*, Case No. 22-1621 (6th Cir. July 15, 2022); *United States v. Wilkes*, No. 1:21-CR-42 (W.D. Mich. May 12, 2022) (ECF No. 89, Sentencing Hr'g Tr.) (Neff, J.), *appeal filed*, Case No. 22-1436 (6th Cir. May 13, 2022); *United States v. Robinson*, No. 1:21-cr-118 (W.D. Mich. Mar. 23, 2022) (ECF No. 67, Sentencing Hr'g Tr.) (Maloney, J.), *appeal filed*, Case No. 22-1230 (6th Cir. Mar. 24, 2022). This Court finds those three decisions to be persuasive authority.

Dr. Dudley's interpretation of the admittedly "obsolete" and "imprecise" term "geometric isomers" as limited to *cis-trans* isomers, which he asserts do not exist for cocaine, would in essence read that word out of the federal statute, 21 U.S.C. § 802(14), which prohibits "optical and geometric" isomers of cocaine. *See also* 21 U.S.C. § 812(c), Schedule II(a)(4). Dr. Dudley contends that the term "geometric" is outdated, obsolete and ambiguous, but that it historically meant *cis-trans* isomers (which he says is a subset of diastereomers). Dr. Dudley states that there are no *cis-trans* isomers of cocaine, and thus, according to him, no geometric isomers of cocaine exist. He contends that the only stereoisomers unambiguously included in the federal definition of cocaine are natural cocaine and its optical isomer (or enantiomer), and that the six diastereomers of cocaine are not included in the federal definition (although Dr. Dudley also concedes in his Report that "Geometric isomer terminology is sometimes applied to describe other types of stereoisomers, including *diastereomers*, but such usage deviates from consensus IUPAC terminology and can create ambiguities"). Thus, according to Dr. Dudley's reasoning, there are no "geometric" isomers of cocaine to exclude, and that term in the federal statute did not add anything to the definition and it is essentially meaningless or mere surplusage.

26

However, such a reading by Dr. Dudley violates the canon of statutory construction that discourages courts from adopting a reading of a statute that renders any part of the statute mere surplusage. *Bailey v. United States*, 516 U.S. 137-146 (1995) (noting that each word in a statute is intended to have "particular, nonsuperfluous meaning.") As the government explained in its Response brief, and at oral argument, Congress amended the federal laws regarding controlled substances in 1984 and deliberately added the term "geometric" isomers with regard to cocaine. (ECF No. 89, Gov't Resp., PageID.554-55 (explaining that "the legislative history shows that Congress added 'geometric' because 'clandestine manufacturers' had attempted to evade the Controlled Substances Act by manufacturing "optical and geometric isomers of cocaine." (citing S. Rep. No. 225, 98th Cong., 2d Sess. 263, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3445 (explaining that the addition of geometric "will assure that those isomers requiring control under the Controlled Substances Act are clearly covered by the statute").) Courts "must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (citation omitted). Dr. Denmark's definition of "geometric isomer" as meaning the six diastereomers of cocaine – the stereoisomers that have a different geometry than natural cocaine – is more persuasive. Dr. Denmark's opinion is consistent with Congress' specific inclusion of the word "geometric" in the statute

as meaning something. Thus, the Court finds that the term "geometric isomers" includes the six diastereomers of cocaine; otherwise the term's addition to the statute is meaningless. District Judges Neff and Maloney came to this same conclusion when the issue was before them. *See United States v. Johnson*, Case No. 1:21-cr-34 (W.D. Mich. July 11, 2022) (Sentencing Hr'g Tr. at 53-54) (Maloney, J.); *United States v. Wilkes*, No. 1:21-cr-42 (W.D. Mich. May 12, 2022) (Sentencing Hr'g Tr. at 44-48) (Neff, J.); *United States v. Robinson*, No. 1:21-cr-118 (W.D. Mich. Mar. 23, 2022) (Sentencing Hr'g Tr. at 8-9) (Maloney, J.).[4]

---

[4] The Court further notes, as the government argued in its Response brief and at oral argument, that the Drug Enforcement Agency (DEA) – the agency that administers the scheduling of controlled substances – also understood "geometric" to include cocaine's six diastereomers. Specifically, the DEA stated, in the Proposed Rule:

> The Dangerous Drug Diversion Act of 1984 expands the existing definition of isomer to include the optical and geometric isomers of cocaine, ecgonine and their salts and derivatives. Under this provision the levorotatory and dextrorotatory forms of cocaine [cocaine and its optical isomer], ecgonine and their derivatives and salts as well as the diastereomers, pseudococaine, pseudoecgonine, allococaine, alloecgonine, pseudoallococaine and pseudoalloecgonine and their optical isomers and salts are included in the term "isomer" as used in 21 U.S.C. 812 Schedule II(a)(4). This amendment clarifies which of the various isomers of cocaine, whether produced naturally or synthetically, are included in the term "isomer" as used in 21 U.S.C. 812 Schedule II(A)(4) and hence are controlled in Schedule II of the CSA. A revision of § 1308.02(c) of 21 CFR is proposed to reflect this change.

The government further argues in its Response brief that accepting Taylor's argument would lead to the absurd result that Michigan convictions for trafficking cocaine do not count as "serious drug offenses." Judge Maloney similarly noted in *Robinson* that accepting Dr. Dudley's interpretation "leads to absurd results, and no Michigan trafficking cocaine conviction would count as an 851 predicate." *United States v. Robinson*, No. 1:21-cr-118 (W.D. Mich. Mar. 23, 2022) (Sentencing Hr'g Tr. at 9) (Maloney, J.). As the government contends, "[i]nterpretations of a statute which would  produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Guzman v. U.S. Dep't of Homeland Sec.*, 679 F.3d 425, 432 (6th Cir. 2012).

The Court finds that Michigan's cocaine statute is not overbroad and that the federal and Michigan definitions of cocaine are categorically the same. Taylor's prior cocaine convictions under Michigan law therefore are proper predicate offenses under the ACCA.

---

51 FR 5370-01.

## III.  CONCLUSION

For the reasons set forth above, the Court REJECTS Defendant Robert Lee Taylor's Objection (ECF No. 81), and finds that Defendant Taylor's three prior Michigan cocaine convictions are proper predicates under the ACCA.

**IT IS SO ORDERED.**

Dated: August 17, 2022                    s/Paul D. Borman
                                          Paul D. Borman
                                          United States District Judge